IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|                   *Plaintiff,* | ) |
| vs. | )   No: 24-CR-0350-GKF |
| | ) |
| BRADY CORT DOZIER, | ) |
| | ) |
|                   *Defendant.* | ) |

## OPPOSED MOTION FOR NON-GUIDELINE SENTENCE

The Defendant, Brady Cort Dozier ("Cort"), respectfully moves this Court to vary downward seven (7) levels from the Total Offense Level and enter a sentence of 188 months. The government opposes this motion to the extent it seeks a sentence less than 360 months of incarceration.

Cort pleaded guilty to two counts in the Indictment, Production of Child Pornography in violation of 18 U.S.C. §§ 2251(a) and (e) and Receipt and Distribution of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). The plea was pursuant to an 11(c)(1)(B) plea agreement, wherein the Government agrees to not seek a sentence of more than 360 months incarceration.

The Pre-Sentence Investigation Report ("PSR") states that he is in criminal history category I and calculates a total offense level of 43. PSR at ¶¶ 49, 53. According to the PSR, a guideline sentence would be 600 months. *Id.* at ¶ 67. Given the advisory guideline range and the stipulation with the government, it seems reasonable to assume the government will file a motion asking for a 360-month sentence. However, Cort requests the Court grant the relief sought in this motion and enter a 188-month sentence of incarceration followed by a five-year term of supervised

1

release.

**

As a preamble for this motion, Cort accepts responsibility for his conduct and understands this Court will hold him accountable. However, the advisory guideline in this case is objectively unreasonable, especially considering this is his first offense. If the Court were to enter a sentence consistent with the advisory guideline, it is a *de facto* life sentence.

There are instances when the courts sentence defendants to extremely lengthy sentences or even life. Those defendants convicted of murder are one such example. It is not an overstatement to say murder is the most serious crime in our criminal justice system, and the punishment for murder is severe. However, it is not uncommon in homicide cases for defendants to receive sentences between 20 and 30 years.

For example, in *United States v. Tommy Ryan Gouge*, 20-CR-64-RAW (EDOK), the defendant murdered his wife by crushing her skull with a car jack. The court sentenced Mr. Gouge to 360 months. In *United States v. John Duncan Stubbs*, 21-CR-143-JFH (EDOK), the defendant shot his girlfriend in the top of the head with a rifle while she was sitting on his front porch. The court sentenced Mr. Stubbs to 240 months. In *United States v. Chad Hudgens*, 22-CR-39-GKF (NDOK), Mr. Hudgens killed his girlfriend by shooting her in the head in his living room. This Court sentenced Mr. Hudgens to 360 months. These are but a few examples of serious offenses with extremely violent conduct, warranting a sentence between 240 and 360 months.

There are factually analogous cases where defendants charged with sex crimes against minors received sentences well below the advisory guideline of this case. The Court should review *United States v. Solomon Lamont Horsechief*, 20-CR-73-RAW (EDOK). In *Horsechief*, the

defendant sexually assaulted a minor female. The court sentenced Mr. Horsechief to 240 months. Likewise, in *United States v. Leo Steban Chumbalooky*, 23-CR-246-JDR (NDOK), the defendant was engaged in a long-term sexually abusive relationship with his minor sibling. The court sentenced Mr. Chumbalooky to 63 months. The facts of *Chumbalooky* are analogous to the case currently before this Court. Certainly, Cort's conduct warrants a sentence less severe than those responsible for the unjustified deaths of loved ones, and a sentence more akin to a case involving sexual abuse of a minor sibling, especially considering the victim only wants his brother to get help for his issues and not serve a lengthy prison term.

**

<u>**ARGUMENT AND AUTHORITY**</u>

**A.      Considering Cort's nature and characteristics justify the requested variance.**

Each person is unique, and it is incumbent upon the court to consider a defendant's history and background in determining an appropriate sentence. The United States Supreme Court directs sentencing district courts to look beyond the crime and tailor a sentence for the convicted person. *See Pepper v. United States*, 562 U.S. 476 (2011). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 487 (*citing Koon v United States*, 518 U.S. 81, 113 (1996)).

Brady Cort Dozier was born on September 26, 2003. His parents are Brian and Andrea Dozier (Birk). Andrea was twenty-three when she and Brian got married. Brian was thirty years old at the time. Cort was born shortly thereafter. He is called "Cort" by his family.

3

Cort was nine months old when his parents separated. The separation was intended to motivate Brian to complete the remodel of the family home. Andrea recalls that she and her children were living in unsafe conditions with electrical sockets, missing drywall, and a lack of carpet or flooring. While nursing nine-month-old Cort, Andrea realized the environment was not appropriate for children, and she needed to keep her children safe. However, remaining married was untenable and after three weeks of attempting reconciliation, Andrea filed for legal separation. The bitter divorce raged from 2003-2008, and the custody battle for Cort's two younger siblings lasted until Cort was an adult.

Cort attended school from kindergarten through third grade in Dewey Public Schools. He was withdrawn due to consistent bladder-related incidents. He ruined two couches from his bedwetting which continued until his teenage years. In seventh grade, he was finally ready to return to Dewey public school. Andrea recalls an incident where a group of teenage boys had Cort against a fence and assaulted him. Again, Cort was withdrawn from school in eighth grade and attended Penn Foster online. He eventually dropped out of school and did not obtain a GED. In 2021, he received a certification for Water Damage Restoration. In 2024, he received a certificate for Biohazard Material. Cort has had consistent employment throughout his teenage and adult life.

Cort grew up in the Jehovah's Witness religion. "The Witnesses' teach strict separation from secular government. Although they are law-abiding in general, believing that governments are established by God to maintain peace and order, they refuse on religious grounds to observe certain laws. They do not salute the flag of any nation, believing it an act of false worship; they refuse to perform military service; and they do not participate in public

elections. These practices have brought them under the scrutiny of government authorities."[1] The only friends the Dozier children had were other friends from their religious services. There are several articles claiming there is widespread sexual abuse in the Jehovah Witness Community. However, the "Watchtower Announcing Jehovah's Kingdom"[2] has continuously denies the allegations.

As a child, Cort was physically and emotionally victimized by his brother, Ethan. It got to a point that Cort refused to sleep in his room with his brother. According to his mother, Ethan was destructive, violent, emotionally and physically abusive and would lash out at Cort. To avoid this abuse, Cort slept on the couch with a knife under his pillow.

Andrea tried to get Ethan into counseling. However, divorced parents must agree that counseling is needed. Ethan has a closer relationship with his father, and Brian would not agree to counseling. Ethan would become disruptive if he could not go to his father's home.

Ethan's hostility towards Cort escalated. The violence in his father's house reached a breaking point when Cort found a necklace that belonged to his father. Such adornments violate the tenants of their religion. However, it was the inscription that concerned Cort. The necklace his dad was wearing was engraved "Love Jehovah, Hate Andrea, Forgive, Question."[3] The necklace combined with Ethan's overt hostility, created an unstable environment, and Cort feared being in his father's home. Additionally, Cort was now concerned about the safety of his mother.

---

[1] Jehovah's Witness - Beliefs, Practices, History | Britannica
[2] The Watchtower Announcing Jehovah's Kingdom is an illustrated religious magazine, published by the Watch Tower Bible and Tract Society of Pennsylvania.
[3] District Court of Washington County, Oklahoma. PO-2014-208

Ethan's counselors noted that he was angry with his mother and made several threats of violence towards her and Cort. He physically assaulted his mother and threatened to beat Cort to death, drag his body into a field, and let his corpse rot. This behavior became too much, and Ethan was sent to live permanently with his father, while Cort remained with his mother.

Eventually, Andrea met Perry Seritt when Cort was thirteen years old. Cort became quickly attached to this positive male role model. He consistently refused to visit his biological father to remain at home with Andrea, Perry, and his siblings. After Ethan moved in with his father, Cort stopped sleeping with a weapon.

In 2022, Perry was diagnosed with brain cancer. Andrea was abandoned by her family at this time, while she was caring for her husband in hospice care. Cort was extremely helpful with taking care of Perry and it was devastating for everyone when Perry passed on April 18, 2023.

The nature, extent, and effect of Cort's childhood trauma cannot be ascertained, but it is undeniable that he has suffered some trauma in his childhood. Cort claims to have no memory of his childhood, and he has never received therapy. However, the impact is apparent, and his background is mitigating in nature and should be considered in determining an appropriate sentence.

**B.     A mechanical application of the 2G2.2 enhancements results in unreasonable and excessive advisory guideline ranges in child pornography cases.**

The application of the guideline enhancements in this case yielded an advisory guideline that is objectively unreasonable. A district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007) (*citing Rita v. United States*, 551 U.S. 338, 347-48 (2007)). However, it is error for a district court to presume that the guidelines range is reasonable. *Id.* at 50. In this case, to impose a guideline

sentence would be an injustice and is contrary to the purposes of federal sentencing. To avoid injustice, "a district court is required to consider seven factors in sentencing." *United States v. Cookson*, 922 F.3d 1079, 1092 (10th Cir. 2019); *see also* 18 U.S.C. § 3553(a). A district court must consider all the factors of Section 3553(a) in determining a sentence after making "an individualized assessment based on the facts presented." *Id.* The guidelines "are only one of the factors to consider when imposing sentence, and § 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall.* at 59; s*ee also United States v. Wiseman*, 749 F.3d 1191, 1195-96 (10th Cir. 2014). The "overarching instruction" of Section 3553 is for the sentencing court to "impose a sentence sufficient, but not greater than necessary," to accomplish the sentencing goals set forth in Section 3553(a)(2). *Kimbrough v. United States*, 552 U.S. 85, 89 (2007).

A sentence of 188 months is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2). The requested sentence would reflect the seriousness of his conviction of production and receipt and distribution of child pornography, and it would provide a just punishment. It would promote respect for the law and have a deterrent effect. The requested sentence would protect the public from the possibility of recidivism by Cort and allow sufficient time for treatment.

Cort's conduct is factually distinguishable from the defendant's conduct in *Cookson*. Cort's convictions are for production and receipt and distribution of child pornography, not its mere possession. However, the Tenth Circuit's analysis and policy disagreements related to the general application of the 2G2.2 enhancements in all cases involving child pornography is the issue.

In *Cookson*, the defendant was arrested after law enforcement linked him to an account on a child pornography internet site. *Cookson*, 922 F.3d at 1083. The defendant was charged with two

counts of possessing child pornography after images were found "on various devices." *Id.* at 1083-1084. He entered a plea of guilty to the charges. *Id.* at 1084. The statutory maximum sentence for the crimes of conviction was twenty years' imprisonment with a minimum of five years' supervised release. *Id.* The defendant's PSR increased the base offense level of 18 to 28 due to the numerous U.S.S.G. § 2G2.2 enhancements, including[:]

> a two-level increase under U.S.S.G. § 2G2.2(b)(2) because the material involved a prepubescent minor;
>
> a four-level increase under U.S.S.G. § 2G2.2(b)(4) because the material involved sadistic or masochistic conduct or other depictions of violence;
>
> a two-level increase under U.S.S.G. § 2G2.2(b)(6) because the offense involved the use of a computer[;] and
>
> a five-level increase under U.S.S.G. § 2G2.2(b)(7)(D) because Mr. Cookson possessed more than 600 images of child pornography.

(The enhancements will be referred to herein as the "2G2.2 Enhancements.")

The defendant had a criminal history category of III, and an advisory guideline range of 97-121 months' imprisonment.[4] *Id.* After hearing from the parties, the district court sentenced the defendant to five years' probation. *Id.* at 1087.

The government appealed the sentence as substantively unreasonable. *Id.* at 1090. The Tenth Circuit reviewed the district court's reasons, noting that the court's explanation had focused on the nature and circumstances of the offense and the history and characteristics of the defendant, citing Section 3553(a)(1). *Id.* at 1092. The Tenth Circuit agreed that the "combination of [the

---

[4] Several of the 2G2.2 Enhancements were applied in an identical fashion in Cort's case. Draft PSR ¶¶ 35-39. Paragraph 36 includes a 2-level enhancement for file sharing pursuant to 2G2.1(b)(3)(F).

8

defendant's] circumstances could reasonably support a downward variance, even a large one," citing Section 3553(a)(1). *Id.* at 1093.

The Tenth Circuit also discussed the district court's policy disagreement with the 2G2.2 Enhancements. *Id.* The *Cookson* court noted that district courts had been specifically cautioned to carefully apply the guidelines regarding child pornography and to "remain mindful that they possess broad discretion in fashioning sentences under § 2G2.2." *Id.* (further quotations and citations omitted). The *Cookson* court cited cases that rejected the 2G2.2 Enhancements "for want of an empirical basis." *Id.* The court also stated that "ubiquitous application of the [2G2.2 Enhancements] resulted in virtually no distinction between sentences" for mere possession when compared to "the most dangerous offenders." *Id.* (further quotations and citations omitted). The Tenth Circuit determined the district court had not abused its discretion in determining that these policy disagreements "could support the imposition of a more lenient sentence." *Id.*[5]; s*ee also DeRusse*, 859 F.3d 1232.[6]

---

[5] The Tenth Circuit discussed at length the failure of the district court to explain how it weighed those reasons, as well as its failure to discuss other Section 3553(a) factors. *Cookson*, 922 F.3d at 1093-95. The *Cookson* court found the sentence "substantively unreasonable" in large part "based on the significant variance in Mr. Cookson's sentence and the district court's limited and inconsistent explanation for that variance." *Id.* at 1095. The Tenth Circuit vacated the sentence and remanded for resentencing while not foreclosing "the possibility that a more detailed explanation from the district court of the weight it afforded § 3553(a) factors other than § 3553(a)(1) could yield a similar, but substantively reasonable, sentence on remand." *Id.* at 1096. On remand, the district court resentenced Mr. Cookson to the same sentence of 5 years' probation. See the Amended Judgment (Docket 86) and Amended Statement of Reasons (Docket 87) *United States v. Cookson*, 17-CR-10087-JWB (D. Kan July 1, 2019). The government did not appeal the result of the resentencing.

[6] The *Cookson* court cited *DeRusse* with approval and used it as an example of affirming a district court that had adequately explained its reasons for departures and variances. *Cookson*, 922 F.3d at 1093-95. The Tenth Circuit in *DeRusse* affirmed a 70-day time-served sentence followed by 5 years' supervised release when the PSR for the defendant's kidnapping offense gave an

The second policy disagreement with the 2G2.2 Enhancements noted by the *Cookson* court was that "ubiquitous application" of the enhancements resulted in no distinction between the sentences. *Cookson*, 922 F.3d at 1093, (*quoting Dorvee*, 616 F.3d at 186-87). Part of the "ubiquitous" application noted by the *Cookson* court has been caused by technology changes. The internet and digital media have drastically increased both the accessibility and volume of child pornography for online consumption. 2012 United States Sentencing Commission Report at 18.

The 2012 Commission Report concluded that the sentencing scheme for child pornography should be updated "to better reflect the technological changes." 2012 Commission Report at 3. The Internet allows for the easy downloading of enormous quantities of child pornography. *See, e.g., United States v. Burgess*, 576 F.3d 1078, 1084 (10th Cir. 2009) (conservative estimate of 70,000 images found). Because of these technological changes, the 2G2.2 Enhancements apply in almost all possession cases. 2012 Commission Report at iii; s*ee also United States v. Kelly*, 868 F. Supp. 2d 1202, at 1204-05 (D.N.M. 2012) ("as widespread as computer use is now, enhancing for the use of a computer is a little like penalizing speeding, but then adding an extra penalty if a car is involved").[7]

Ultimately, the 2G2.2 Enhancements describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 868 F. Supp. 2d at 1208. Applying enhancements in almost every case is contrary to the

---

advisory guidelines range of 108-135 months. *DeRusse*, 859 F.3d 1232.

[7]   The enhancement in Section 2G2.2(b)(7) based on number of images applies in nearly every case, 96.9% of 2010 non-production cases. 2012 Commission Report at 209, Table 8-1. The enhancement of Section 2G2.2(b)(2), "the materials involved a prepubescent minor or a minor who had not attained the age of 12 years," was applied in 96.3% of non-production cases in 2010. 2012 Commission Report at 105, 209, Table 8-1.

purpose of enhancements, which are meant to increase a sentence for conduct that is more aggravated than the typical type of offense. *See United States v. Bridges*, 50 F.3d 789, 791-92 (10th Cir. 1994) (incorporating two-level enhancement into every case involving theft "would inevitably render the very concept of 'enhancement' meaningless"); *United States v. Landmesser*, 378 F.3d 308, 313 (3d Cir. 2004) (vacating sentence when district court's application of enhancement in case involving release of anhydrous ammonia during a theft would apply to "every instance" of such a release thus rendering the language of the enhancement "meaningless"); *see also Benoit*, 605 Fed. Appx. at 704, 707 (quoting Judge Payne's decision to grant a downward variance because the two-level enhancement for using a computer to receive pornographic images "applies in virtually every case and, thus, fails to differentiate among offenders with respect to their involvement in child pornography communities").

In this case, the statutory penalty ranges from fifteen (15) to thirty (30) years in prison on Count I and zero (0) to twenty (20) years in prison on Count II. Because Cort has no criminal history points, and the facts of his crimes are typical, it might be expected that his sentence would be within the statutory penalties. Instead, the advisory guidelines apply multiple enhancements that expose even this first-time offender to an advisory guideline sentence of 600 months. Such a sentence is contrary to Congressional intent as reflected in the statutory penalty.

This Court has substantial discretion in sentencing Cort. The advisory guideline range is only one factor to be considered, and this Court should consider all the 3553(a) factors in reaching the conclusion that the requested sentence is sufficient, but not greater than necessary, to comply with all the purposes of sentencing.

**C.     Leniency is appropriate considering Cort's age at the time of the offense conduct makes him less culpable than someone who had reached the age of maturity.**

Our culture holds children less culpable for their conduct than adults. To subject young people to adult-prison sentences is unreasonable. It is for this reason the United States Sentencing Commission has finally acknowledged that young people are different than adults and consequently amended § 5H1.1 Age (Policy Statement) to state, "[c]ertain risk factors may affect a youthful individual's development into their mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of education opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into adulthood."

At the time of the offense, Cort was nineteen years old, and he now stands before this Court a twenty-one-year-old young person, possessing a limited education, some job skills, and a troubled background. This same young man faces a reality of reaching maturity while incarcerated in one of a most violent environments imaginable. Even the Sentencing Commission understands that a term of incarceration for such a young person will probably do more harm than good. A term of incarceration in the Bureau of Prisons is not an environment where a young person grows into a law-abiding citizen, gets proper mental health treatment, or learns respect for the law and the interests of justice. On the contrary, an extremely lengthy term of imprisonment is far more likely to produce a broken, hopeless person filled with anger and spite.

Our society recognizes that young people are a vulnerable class, and based solely on age, society restricts what young people can and cannot do. Their right to drive, vote, drink alcohol, or enter legally binding contracts is limited based on their age. The obvious reason for such

restrictions is that young people are not well equipped mentally or emotionally to make good and reasoned decisions.

Neuroscientists have weighed in on the mental development of young people and how they should be treated in the criminal justice system. A study suggests that scientists extended the period of adolescence from puberty into the twenties. [8] Dr. Ruben Gur, Ph.D., wrote in an amicus brief to the Supreme Court that "[t]he evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable… Indeed, age 21 or 22 would be closer to the 'biological' age of maturity." *Id.* Likewise, Dr. Deborah Yurgelun-Todd of the Brain Imaging Laboratory at Harvard University Medical School has studied the adolescent brain and concluded that adolescents are emotional thinkers that "respond more strongly with gut response than they do with evaluating the consequences of what they are doing."[9] These scientific studies support the Sentencing Commissions conclusion that while young people are still culpable for their actions, they are less so than a fully developed adult and should be treated accordingly.

The United States Supreme Court has held that people lacking fully developed mental functions should be less culpable for their actions than a person with fully developed mental functioning. In *Atkins v. Virginia*, 536 U.S. 304, 318 (2002), the Court held "because of their

---

[8] Gur, Ruben C. Declaration of Ruben C. Gur, Ph.D., *Patterson v. Texas,* Petition for Writ of Certioarri to U.S. Supreme Court, J. Gary Hart, Counsel. (online at https://capitalpunishmentincontext.org.files/resources/juveniles/guraffidaviit.pdf).

[9] PBS Frontline, *Inside the Teen Brain*, *see* interview with Debroah Yurgelun-Todd. (online at https://www.pbs.org/wgbh/pages/frontline/shows/teenbrain/interviews/todd.html).

impairments…by definition they have diminished capacities to understand and process mistakes and learn from experiences, to engage in logical reasoning, to understand reactions of others…Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." Though the *Atkins* court was addressing a defendant with mental retardation, its core principle—that reduced cognitive function lessens culpability—is equally applicable here. The ongoing neurological development of young people like Cort results in similar limitations in judgment, impulse control, and the ability to fully appreciate the consequences of their actions. Therefore, this Court should consider that Cort's youth at the time of the offense conduct diminished his culpability in a manner analogous to the diminished capacity recognized in *Atkins*.

In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court directly addressed the issue of juvenile culpability in a case involving a seventeen-year-old convicted of capital murder. The Supreme Court, applying the principles of *Atkins,* reasoned that because juveniles are more susceptible to irresponsible behavior "their irresponsible behavior is not as reprehensible as that of an adult." *Roper* at 1190 (quoting *Thompson v. Oklahoma*, 487 U.S. 815 (1988)). The *Roper* Court further emphasized the reduced control young people have over their environment, stating that "[t]heir own vulnerability and comparative lack of control over their immediate surroundings means juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their environment." *Id.* at 1195. "The signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.* at 1196. The Supreme Court seems to be suggesting that sentencing courts should

14

treat young offenders with a little more leniency because of their inherent immaturity which is lost with age.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court further reinforced the necessity of individualized sentencing for young offenders. The Court held that Alabama could not impose a mandatory life sentence without parole on a juvenile offender as such a sentence ran afoul of the Constitution. *Id.* The Court, applying the reasoning from *Roper*, explained that the law requires "a sentencer follow a certain process – considering an offender's age and attendant characteristics – before imposing a particular sentence." *Id.* at 483. Additionally, a sentencing court should also consider the offender's background, and mental and emotional development in assessing culpability. *Id.* at 476. This underscores the importance of a nuanced approach to sentencing Cort, considering all mitigating factors related to his youth.

Given Cort's age, education, background, and attendant characteristics, it is apparent that he is still maturing and has yet to fully develop the relevant part of the brain that governs impulsiveness, judgment, planning, foresight of consequences, and other characteristics that make people morally culpable. It is for these reasons that Cort asks this Court to recognize what the Supreme Court and the Sentencing Commission clearly realize – Cort is not yet the person that he will become. This Court's decision will indelibly shape that unfolding. To sentence Cort to a lengthy term of imprisonment within the brutalizing environment of a federal penitentiary would not only represent a failure to recognize his capacity for change but would actively extinguish any realistic hope of his becoming a contributing, responsible, and redeemed member of society. Instead, this Court has the power to offer a sentence that reflects both justice and the possibility of transformation.

**D.     The significant risk of abuse Cort faces in the penitentiary warrants serious consideration by the Court.**

Cort is a young man with delicate features, and he has been convicted of crimes that even hardened criminals find abhorrent. It is very likely that he will be targeted by fellow inmates and potentially subjected to assault during his incarceration. This Court should consider Cort's vulnerability if he were to be imprisoned for any amount of time. *Koon v. U.S.*, 518 U.S. 81, 106-07 (1996) (sentencing courts have discretion to consider collateral consequences); *United States v. LaVallee*, 439 F.3d 670, 707-08 (10th Cir. 2006) (affirming district court's application of two-level downward departure based on susceptibility to abuse in prison). Cort respectfully requests that this Court take potential abuse in prison into account in determining the appropriate sentence.

**E.     Cort's has no criminal history points and that is an indicator that there is little to no risk of recidivism.**

As stated earlier, this is Cort's first offense, and not to diminish the serious nature of his crime, but the likelihood that he will reoffend is remote. The United States Sentencing Commission's own data suggests that Cort is not likely to recidivate. As noted above, Cort falls within Criminal History Category I, and his criminal history score is zero. According to one study conducted by the Sentencing Commission, offenders with a Criminal History Category of I are less likely than others to re-offend. *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 28, (May 2004).[10] *See also Recidivism and the "First Offender"* (May 2004) at 17.[11]

---

[10]     Available at https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines (last visited 4/13/2020).

[11]     Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (last visited

**F.     The collateral consequences of Cort's conviction will sufficiently deter criminal activity, promote respect for the law, and provide just punishment.**

Cort will live with the consequences of his actions for the rest of his life. Even after he is released from custody, he will continue to pay for his crime. He will be subjected to a lengthy term of supervised release with restrictive conditions. The United States Supreme Court has recognized that even probation constitutes a punishment that substantially restricts liberty. *See Gall*, 552 U.S. at 48-49 and n. 4 (explaining that conditions of probation substantially restrict the liberty of probationers). Due to the nature of the offense, Cort will be required to register as a sex offender, with the publication of that information to the community. This registration comes with significant limitations on where he may reside for the rest of his life.

## **CONCLUSION**

Given all the arguments set forth herein, the purpose of federal sentencing, and the 3553(a) factors, Cort respectively requests this Court to sentence him to 188 months in prison and five years of supervised release.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Julia L. O'Connell, Federal Public Defender

By:     */s/Robert S. Williams*
Robert Scott Williams, Okla. Bar No. 19974
Assistant Federal Public Defender
One West Third Street, Suite 1225
Tulsa, Oklahoma 74103-3532
Telephone: (918) 581-7656
Facsimile: (918) 581-7630
E-mail: Robert_Williams@fd.org
*Counsel for Brady Cort Dozier*

---

4/13/2020).

**CERTIFICATE OF SERVICE**

      I certify that on the 21st day of April 2025, I hand delivered the foregoing document to the Clerk of Court. Counsel then delivered a file-stamped copy of the Sentencing Memorandum to the counsel for the Government:

Aaron Jolly
Ashley Robert
Assistant United States Attorneys

                                        */s/Robert S. Williams*
                                        Robert Scott Williams